UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| In re: LG Motors, Inc., Debtor. | Bankruptcy No. 09-B-70041<br>Adversary No.<br>Chapter 11<br>Judge Manuel Barbosa |
|---|---|

## MEMORANDUM OPINION

This matter comes before the Court on motions of William T. Neary, United States Trustee (the "U.S. Trustee"), and creditor Manheim Automotive Financial Services, Inc. ("MAFS") to convert the Debtor's case to Chapter 7 pursuant to 11 U.S.C. § 1112(b). For the reasons set forth herein, the Court will grant the U.S. Trustee's and MAFS's motions.

## JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## FACTS AND BACKGROUND

The following facts and procedural history are taken from the U.S. Trustee's Motion to Convert, MAFS's Motion to Convert, the Debtor's Response to Conversion Motions, and from

the testimony and evidence presented and admitted at the evidentiary hearing held on October 14, 2009.

The Debtor, LG Motors, Inc. ("LG Motors"), is an Illinois corporation formed by Lawrence Goldstein ("Mr. Goldstein"), its president, sole director and sole shareholder. Mr. Goldstein used to sell automobiles, using a sole proprietorship doing business as Largo Automotive. He predominantly sold automobiles, but also sold small vehicles such as pocket bikes and ATVs. LG Motors was formed as a finance company to offer financing to customers purchasing vehicles sold by Mr. Goldstein. It was solely connected with Mr. Goldstein's dealership and did not finance vehicles purchased from any other company than Largo Automotive, though apparently it occasionally sold pocket bikes or ATVs directly to customers. Only Mr. Goldstein had a dealer's license from the State of Illinois, so LG Motors could not sell automobiles directly to customers.

Mr. Goldstein had independent bank financing to purchase inventory. LG Motors received its initial funding for its program to finance customers of Mr. Goldstein in part from a loan from MAFS, which is the largest creditor of LG Motors. At some point pre-petition, Mr. Goldstein's dealer's license was not renewed by the Illinois Secretary of State for his failure to transfer certificates of title to customers within the appropriate amount of time on 74 occasions. Mr. Goldstein claims that, for at least some of these occasions, he was unable to transfer the certificate of title because either his bank financers or MAFS had possession of the certificate of title and refused to release it. Since he lost his license, Mr. Goldstein has continued to sell small vehicles, such as pocket bikes and ATVs, which do not require a dealer's license. It is unclear what LG Motors' role has been post-petition, but apparently it has continued to provide

financing for these small vehicles or, in some instances, to sell them directly to customers. Additionally, Mr. Goldstein has sold four automobiles in 2009, relying on what he claims is an exception under Illinois law that allows individuals to sell up to 7 or 10 vehicles per year without a license. It is unclear from the record whether the customers for any of these four automobiles received financing from the Debtor.

Mr. Goldstein filed a petition for relief under Chapter 11 with this Court on January 8, 2009. His case was subsequently converted to Chapter 7 on September 30, 2009. LG Motors filed a petition for relief under Chapter 11 with this Court on January 8, 2009, the same date as Mr. Goldstein's petition. In the schedules to its petition, LG Motors listed $135,000 in total assets, consisting of $120,000 in accounts receivable and $15,000 in "assorted vehicles" constituting inventory. In Mr. Goldstein's bankruptcy schedules, he listed $280,000 in accounts receivable, $10,000 in a checking account, no inventory, and $261,500 consisting of his residence, his car, his clothing and household furnishings, and his office equipment. Mr. Goldstein's schedules are relevant, because there are indications that he commingled assets with the Debtor, and may have claimed a different allocation of accounts receivable and cash between himself and the Debtor differently at different times to suit his purposes at the time. The allocation of assets is further muddled because the Debtor and Mr. Goldstein have filed only joint monthly operating reports during the pendency of the cases, which do not distinguish or allocate assets, expenses or cash flow between the two.[1] Testimony at trial demonstrated that the

---

[1] Mr. Goldstein testified that he did this on the request of someone at the U.S. Trustee's office. Based on the testimony and evidence presented to the Court, the Court has no doubt that the U.S. Trustee would want to have information on both the individual and the corporation, in order to better monitor Mr. Goldstein and prevent him from trying to hide assets by shifting them to either himself or the corporation. However, the Court doubts that the U.S. Trustee wanted combined reports that made no distinction as to the allocation of assets, by which he could still obscure the allocation of assets between himself and the corporation as he chose. Because of the ambiguous reports,

total combined accounts receivable decreased from $400,000 to $235,286.32 as of October 5, 2009. Mr. Goldstein claimed that the losses occurred solely with respect to Mr. Goldstein's receivables and that LG Motors' receivables have actually increased to $185,000 while Mr. Goldstein's receivables decreased to $50,000. However, this assertion is not credible, especially when considering the evidence of a significant decrease in business since the bankruptcy filing and since Mr. Goldstein lost his dealer's license. More plausible is that it simply suits Mr. Goldstein's purposes at this time to allocate assets to LG Motors, of which he is currently in control as sole director of a debtor-in-possession, instead of his own estate, which is currently under the control of a Chapter 7 trustee. Therefore, the Court finds that, despite the Debtor's contention to the contrary, the accounts receivable properly attributable to LG Motors have decreased substantially since the petition date. Nor have they been converted into other assets of the Debtor. As recently as early August 2009, LG Motors and Mr. Goldstein together only had about $10,000 in inventory. As of the end of July 2009, LG Motors and Mr. Goldstein combined had $6,500 in cash on hand, and as of the end of August 2009, had $7,487 in cash.

There are also no indications that LG Motors can become profitable. The Debtor's combined monthly operating reports for the first portion of 2009 list a profit of $182 for January, a loss of $1,166 for February, a profit of $5,948 for March, a loss of $12,760 for April, a profit of $4,010 for May, a profit of $1,684 for June, a loss of $5,489 for July, and a profit of $4,448 for August, or a net loss of $3,145 for the year. Moreover, it appears that most of the cash flow coming in is from receivables existing prior to the petition date, and that a substantial portion of

---

the Court must look at the purported assets of both the corporate and the individual debtor, and will take judicial notice of the bankruptcy petition and schedules filed in Mr. Goldstein's case for this purpose

the post-petition expenses are for the personal, non-business-related and non-ordinary-course expenses of Mr. Goldstein individually.

In January 2009, either the Debtor or Mr. Goldstein paid $5,000 in legal bills to a lawyer representing Mr. Goldstein individually in his divorce. Mr. Goldstein admitted that he did not know whether he made payments from his personal funds or from the Debtor's funds. In April 2009, the Debtor/Mr. Goldstein paid $5,000 in personal legal bills and $15,000 to post a bond to release Mr. Goldstein from jail in connection with a criminal proceeding instituted against him individually in Winnebago County. The testimony and evidence demonstrate many other examples of the use of the Debtor's assets to pay for Mr. Goldstein's personal expenses, including the monthly payment of Mr. Goldstein's residential mortgage and numerous other items marked "personal expenses" on the operating reports. Mr. Goldstein also admitted that he or the Debtor regularly borrowed money from his father during the pendency of the cases, totaling thousands of dollars, through the use of his father's credit card. He further admitted that he paid his father back sometime after his father received the monthly credit card bills. He admits that neither he nor the Debtor borrowed in such a manner prior to the bankruptcy, and that he did so without authorization of the Court. The funds were often used for individual personal expenses, such as the non-bankruptcy related legal bills of Mr. Goldstein.

The Debtor has a history of failing to pay its quarterly fees to the U.S. Trustee. The Debtor failed to pay the quarterly fee for the first quarter of 2009 by April 30, 2009. The U.S. Trustee brought a motion to convert, and the Debtor's case was converted to Chapter 7 on June 10, 2009. The Debtor subsequently paid the fee in June 2009, and the conversion order was vacated on July 1, 2009. The Debtor also failed to pay the quarterly fee for the second quarter of

2009 by July 31, 2009. After the U.S. Trustee brought the current motion to convert, the Debtor paid the second quarter fees in September 2009.

## DISCUSSION

### A. Section 1112(b)

Section 1112(b)(1) provides that:

> (b)(1) Except as provided in paragraph (2) of this subsection ... and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C.A. § 1112(b)(1) (West 2009). Section 1104(a)(3) gives the Court the discretion to order the appointment of a trustee instead of converting or dismissing the case, if it determines such appointment is in the best interests of creditors and the estate. Section 1112(b)(2) provides that a case shall not be dismissed or converted under Section 1112(b)(1) absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor objects and establishes that:

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)--
> (i) for which there exists a reasonable justification for the act or omission; and
> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C.A. § 1112(b)(2) (West 2009). Section 1112(b)(4) gives a non-exhaustive list of acts or omissions that can constitute 'cause,' including:

(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
(B) gross mismanagement of the estate; ...
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; ...[and]
(K) failure to pay any fees or charges required under chapter 123 of title 28; ....

11 U.S.C.A. § 1112(b)(3) (West 2009). In other words, if the movants can demonstrate substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, the Court must either order the appointment of a trustee or dismiss or convert the case unless the Debtor can prove unusual circumstances justifying the denial of the request. The same is true for the other forms of 'cause,' except that if the Debtor can demonstrate (1) a reasonable justification for the act or omission, (2) a likelihood of cure within a reasonable period, and (3) a reasonable likelihood that a plan will be confirmed within the timeframe set by the Bankruptcy Code, then the burden shifts back to the movants to demonstrate unusual circumstances justifying the granting of the motion. "Unusual circumstances" contemplates conditions that are not common in chapter 11 cases. In re Dovetail, Inc., No. 07-B-72820, 2008 WL 5644889, at *3 (Bankr. N.D. Ill. Dec. 31, 2008) (citing In re Pittsfield Weaving Co., 393 B.R. 271, 274 (Bankr. D.N.H. 2008)).

### B. Substantial or Continuing Loss or Diminution and Absence of a Reasonable Likelihood of Rehabilitation

The movants have demonstrated a substantial and continuing loss to or diminution of the estate since the petition date. Although, as noted above, it is somewhat difficult to determine from the Debtor's monthly operating reports the status of its assets over time because the Debtor

filed only ambiguous combined reports, the Court finds that the movants have demonstrated that the Debtor's accounts receivable have diminished greatly since the petition date while cash on hand and inventory have also decreased. The Debtor has not identified any additional assets of the Debtor's estate that were purchased with the proceeds of the accounts receivable, while the movants have demonstrated numerous instances in which the cash or proceeds of accounts receivable or inventory were used for Mr. Goldstein's individual and personal expenses unrelated to the Debtor's business. For example, he has used the Debtor's funds to pay his personal mortgage, to repay loans to his father, and to pay legal fees related to his divorce and criminal proceedings brought against him individually.

The movants have also demonstrated the absence of a reasonable likelihood of rehabilitation. The issue of rehabilitation for purposes of Section 1112(b)(4)(A) "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Rey, Nos. 04-B-35040, 04-B-22548, 06-B-4487, 2006 WL 2457435, at *6 (Bankr. N.D. Ill. Aug. 21, 2006) (citing In re Original IFPC Shareholders, Inc., 317 B.R. 738, 742 (Bankr. N.D. Ill. 2004)). The Debtor's business was originally set up as a financing company to provide customer financing for automobiles sold by Mr. Goldstein through his sole proprietorship. Mr. Goldstein no longer has a license to sell automobiles, meaning there is no longer a market for the Debtor to finance purchases of automobiles. Now, instead of running a car dealership, Mr. Goldstein is selling small recreational vehicles, such as pocket bikes and ATVs. While a reorganized company does not have to have an identical business model as the pre-bankruptcy entity, there is no evidence that LG Motors can be profitable financing only small vehicles. There is also no evidence that

Mr. Goldstein will be able to obtain a license to sell automobiles in the near future. The monthly operating reports demonstrate the combined business of Mr. Goldstein and LG Motors has been operating at a net loss of $3,145 for the first eight months of 2009. Moreover, there are indications that most of the income received was from payments on existing receivables not origination of new sales and leases. Also, it seems a large portion of the proceeds of those receivables was used for personal expenses, not to increase inventory. Therefore, the evidence and testimony present a picture of a company that is simply collecting and liquidating its accounts receivable, not an active company creating new profits.

This is precisely the situation that Section 1112(b)(1) and (4)(A) were designed to protect creditors from. If the estate is not diminishing, creditors will not be prejudiced by being asked to wait to see if the Debtor can propose a plan. Or, if the business is likely to generate substantial profits in the future, creditors will be better off being paid by that future revenue. But where, as here, the existing assets and receivables are diminishing and there is no likelihood of future profits, creditors' only real hope is to cut their losses by forcing the Debtor to liquidate as soon as possible. Therefore, the Court finds that the movants have demonstrated cause for the Court to order the conversion of the Debtor's case to Chapter 7.

The Debtor argues that the Court should not order conversion because "unusual circumstances" exist. It argues that that one reason that Mr. Goldstein lost his dealer's license is that creditors, including MAFS, inappropriately took possession of certificates of title for vehicles financed through LG Motors, which caused Mr. Goldstein to be unable to transfer titles to the customers in the time required by Illinois law. However, the exception in Section 1112(b)(2) applies only where the unusual circumstances establish that relief is not in the best

interests <u>of creditors and the estate</u>. Even if MAFS played a part in Mr. Goldstein losing his license, it does not change the fact that the creditors' chances of repayment on their loans are rapidly diminishing as the Debtors' assets go down the drain. Also, MAFS is not the Debtor's only creditor. The Debtor's bankruptcy schedules listed ten creditors other than MAFS, and the U.S. Trustee also seeks to convert the case to Chapter 7. The Court therefore finds unusual circumstances do not exist.

### C. Other Evidence of Cause.

The Court's conclusion is further strengthened by the fact that there appears to be evidence of numerous other types of cause to dismiss or convert the Debtor's case. The movants have demonstrated gross mismanagement of the estate. As discussed above, the reason that the assets of the estate are diminishing is not simply because of depreciation, but because of the acts of the Debtor and its sole shareholder and president, Mr. Goldstein. Therefore, the receivables have not decreased in value simply because the obligors stopped paying and the receivables were written off. Instead, it appears that payments came in, but rather than holding the cash or investing it in new inventory, Mr. Goldstein spent it on his own personal expenses. It is also troubling that Mr. Goldstein appears to have regularly commingled the assets of the Debtor with his own assets. For example, at trial, he admitted that he did not know whether a payment to his personal criminal lawyer came from his own account or from an account of LG Motors. The facts also demonstrate that the Debtor made numerous payments of cash of the estate in non-ordinary course transactions, such as to retain and pay personal criminal and divorce lawyers, without the authorization of the Court pursuant to Section 363(b). Furthermore, the Debtor

obtained credit from Mr. Goldstein's father out of the ordinary course of business and repaid him without authorization of the Court pursuant to Section 364. Finally, the U.S. Trustee notes that the Debtor was two months late in paying its quarterly fee for the first quarter of 2009 and two months late in paying its quarterly fee for the second quarter of 2009.

Although the Debtor was subsequently able to cure its omission with respect the quarterly fees by paying them late, it has offered no reasonable justification for its omission. Nor has it offered a reasonable justification for its mismanagement of the estate. Therefore, even if the Debtor were able to confirm a plan within the timeframe set by the Bankruptcy Code, which seems highly doubtful, Section 1112(b)(2) would not provide an exception for dismissal because of gross mismanagement of the estate or failure to timely pay fees. These are further reasons why the Debtor's case should be dismissed or converted.

### D. Section 1104(a)(3)

Having found cause to dismiss or convert the Debtor's case, the Court does not feel it would be in the best interests of creditors to appoint a trustee or an examiner. While a trustee might be able rein in the inappropriate use of the Debtor's assets to pay the personal expenses of Mr. Goldstein, it is unlikely a trustee would be able to make the Debtor profitable. For example, it is doubtful that a trustee would be able to increase sales of the small vehicles, and would be unable to solve the problem of the lack of a dealer's license. Part of the problem is that, as a financing company, the Debtor has to rely entirely on the sales of Mr. Goldstein to generate future receivables. Therefore, the Court will order the conversion of the Debtor's case to Chapter 7.

## CONCLUSION

For the foregoing reasons, the Court will grant the movants' motion to convert the Debtor's case to Chapter 7.

THEREFORE, IT IS ORDERED that the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: November 25, 2009

The Honorable Manuel Barbosa
United States Bankruptcy Judge